UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                :

RICHARD LEDERER,                :

                  :

          Plaintiff,       :

                  :              04 Civ. 9664

         -v-             :

                  :       **OPINION AND ORDER**

BP PRODUCTS NORTH AMERICA,   :

                  :

         Defendant.     :

                  :
-------------------------------------------------------x

Joan M. Campbell, New York, New York,
for plaintiff.

Jennifer T. Keegan, Montgomery, McCracken,
Walker & Rhoads, LLP (Edward T. Ellis,
Montgomery, McCracken, Walker & Rhoads,
LLP; Donald J. Kravet, Kravet & Vogel, LLP,
New York, New York, on the brief), Cherry Hill,
New Jersey, for defendant.


GERARD E. LYNCH, District Judge:

       Plaintiff Richard Lederer brings this employment discrimination action against his former

employer, defendant BP Products North America ("BP").  Plaintiff alleges that he was

wrongfully terminated and subjected to a hostile work environment in violation of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., Title VII of the Civil Rights Act of

1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 290 et seq., and the New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 et seq.  Defendant now moves for summary

judgment.  The motion will be granted in part and denied in part.

**BACKGROUND**

Most of the relevant facts in this case are disputed.  The following discussion draws on both parties' versions of the facts to give an overview of the relevant events and accusations.[1]

In January 2002, plaintiff began working as a baker at a "BP Connect" store owned by defendant in Bayside, Queens.  This store was the first in what became a series of BP establishments at which customers can find gasoline pumps, convenience stores, and small cafes that sell pastries, soups and sandwiches.  Plaintiff was hired when the store opened and, aside from what defendant claims were occasional attendance problems, was by all accounts a good baker until the night of April 4, 2003.  (D. 56.1 Stmt. ¶¶ 41-46; P. 56.1 Stmt. ¶¶ 41-46.)

That night, plaintiff was scheduled to work the night shift.  Shortly after showing up for work, however, plaintiff took thirty dollars from a cash register, left a note explaining that his leased car had broken down on the Grand Central Parkway (Keegan Aff. Ex. 22), and left the store.  Lederer did not finish the night's baking; the bagels, defendant alleges, were ruined, and the danishes left unfinished.  Lederer did not call any other employees to alert them to his absence.  When the store opened, the store was short of baked goods during the morning rush hour.  (D. 56.1 Stmt. ¶¶ 81-84.)  Lederer was fired in short order. (Id. ¶¶ 86-92; Compl. ¶¶ 59-64.)

_____

[1] Defendant argues that the Court should disregard Lederer's affidavit, because it contradicts his prior testimony.  (D. Reply at 8-9.)  Of the purported contradictions, most are not material to this motion for summary judgment; the others, as will be discussed below, are not contradictions at all.  Defendant also argues that the Court should disregard plaintiff's statement of material facts because it contains legal arguments.  (Id. at 9-10.)  Defendant points to no specific legal argument in the submission in question, however, and in any event the Court is entirely capable of separating facts from arguments should it become necessary to do so.

Plaintiff argues that although his actions on April 4 were admittedly cause for termination, they were in fact nothing more than a convenient excuse for his firing.  He argues that he was fired — and, prior to his termination, subjected to a hostile work environment — because he is gay, and because he has AIDS.

Plaintiff alleges that Kenneth Stockman, a manager at the Bayside store, and other employees repeatedly made sexually offensive remarks to him and around him.  (See Lederer Dep., Keegan Aff. Ex. 1 ("Lederer Dep."), at 255-56).  Stockman allegedly made various comments about another gay employee, calling him "faggot" and saying "I don't know how he can work, he's always on his knees."  (Lederer Dep. at 244, 248, 250.)  Stockman also allegedly made sexual remarks to and about Lederer, such as calling him "Anaconda," a reference to his penis.  (Lederer Dep. at 244.)  Stockman would also single out Lederer for conversations about homosexuality, saying things like "I don't know how two men get it on like that," and specifically talking in graphic terms about oral and anal sex between men, asking, "Could you ever see yourself blowing another man[?] Isn't that disgusting?"  (Lederer Dep. at 275.)  Lederer also claims that Stockman repeatedly questioned him as to whether he "wanted to blow" Stockman.  (Compl. ¶ 33.)  Lederer states that these remarks were made "in a very loud, obnoxious and taunting tone." (Id. ¶ 34.)

At least some of the comments by some of the employees were made in ignorance of Lederer's sexual orientation.  Lederer told the other employees that he was or had been married to a woman, and that he had children from that previous marriage.  (Lederer Dep. at 241-42.)  Although Lederer did not explicitly reveal his sexual orientation to anyone at the Bayside BP Connect until March 2003, however, Lederer believes that Stockman understood him to be gay

3

when Stockman made earlier harassing remarks, because Stockman seemed so interested in the subject of Lederer's sexuality and his opinions on homosexuality.  (Lederer Dep. at 274.)

In March 2003, Stockman demanded from Lederer a doctor's note explaining an earlier absence from work.  When Lederer produced a note explaining that he had Hepatitis C, Stockman expressed a belief that that disease was only contracted by drug users or those who had intimate contact with them.  Lederer revealed that he was infected with HIV, and that the Hepatitis C was related to this condition, not drug use.  Stockman asked Lederer whether he had gotten AIDS from a man or a woman, at which point Lederer revealed that he was gay.  (Compl. ¶¶ 38-48.)  Stockman asked if he had been "blowing guys in the [kitchen] cooler."[2]  (Compl. ¶ 49.)

On December 9, 2004, Lederer filed the complaint that began this action, alleging violations of the ADA, Title VII, the NYHRL, and the NYCHRL.  Defendant now moves for summary judgment.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no

_____

[2] Defendant argues that the Court should disregard plaintiff's claims about insulting remarks made by Stockman after the revelation of plaintiff's HIV status and sexual orientation, because those claims are contradicted by plaintiff's deposition testimony.  (D. Reply at 9.)  On the cited pages, however, plaintiff is asked only once to recount what Stockman said in response to his revelations and is not asked to give detail or to recount Stockman's specific remarks. (Lederer Dep. at 156.)  Although plaintiff has elsewhere given more detail concerning this interaction, there is no direct inconsistency between the deposition testimony and plaintiff's other representations.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue of material fact" exists if the evidence is such that a reasonable factfinder could find in favor of the non-moving party. Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). The moving party bears the burden of establishing the absence of any genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

In deciding a summary judgment motion, the court must "resolve all ambiguities and draw all reasonable references in the light most favorable to the party opposing the motion." Cifarelli v. Babylon, 93 F.3d 47, 51 (2d Cir. 1996). At this stage, the court is not to make any credibility assessments or weigh the evidence. Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and must make a "showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## II.   The ADA Claim

Plaintiff claims to have been unlawfully terminated under the ADA (Compl. ¶¶ 69-73), which provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a). Defendant contends that plaintiff has failed to produce evidence sufficient to establish a prima facie case for relief.

ADA employment discrimination claims are subject to the familiar burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), under which "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006). To establish a prima facie case for relief, plaintiff must show that

> (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered [an] adverse employment action because of his disability.

Cameron v. Community Aid For Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003), quoting Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001) (citation omitted).

The first and third aspects of this standard are not at issue here, because defendant concedes that it is an employer subject to the ADA and that plaintiff was qualified to do his job as a baker. (D. Mem. at 20.) Defendant argues, however, that plaintiff has failed to show that he was disabled, or that his termination was because of his disability.

### A.     Whether Plaintiff Was Disabled

Defendant argues that plaintiff cannot show that his HIV infection qualifies as a disability under the ADA. (D. Mem. at 19.) The ADA defines disability as "a physical or

mental impairment that substantially limits one or more of the major life activities of [an]

individual."[3]  42 U.S.C. § 12102(2)(A).  This language, in turn, gives rise to a three-part inquiry:

> First, we consider whether respondent's HIV infection was a
> physical impairment.  Second, we identify the life activity upon
> which respondent relies . . . and determine whether it constitutes a
> major life activity under the ADA.  Third, tying the two statutory
> phrases together, we ask whether the impairment substantially
> limited the major life activity.

Bragdon v. Abbott, 524 U.S. 624, 631 (1998).  As to the first prong of the inquiry, HIV infection

"is an impairment from the moment of infection."  Id. at 637.  It must therefore be determined

whether this impairment substantially limits a major life activity.  See Bragdon, 524 U.S. at 642

(declining to reach the question of "whether HIV infection is a per se disability under the

ADA").

Although the ADA requires a case-by-case inquiry into whether HIV infection

substantially limits a major life activity of each individual plaintiff, the Supreme Court's holding

that reproduction is a major life activity, see id. at 639, is dispositive of most cases.  See Colwell

v. Suffolk County Police Dep't, 158 F.3d 635, 642 (2d Cir. 1998) ("In deciding whether a

particular activity is a 'major life activity,' we ask whether that activity is a significant one

within the contemplation of the ADA, rather than whether that activity is important to a

particular plaintiff.").  As this Court held in Teachout v. New York City Department of

Education, No. 04 Civ. 945, 2006 WL 452022 (S.D.N.Y. 2006), "[i]t is not necessary for a

plaintiff to want to have children, or for a plaintiff to plan to have children, to show that his

---

[3] The ADA also defines disability to include "(B) a record of such an impairment; or
(C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  Neither of these
provisions are at issue in this case.

ability to have children has been substantially limited by infection with HIV." Id. at *7.  If a plaintiff is physically incapable of reproduction for reasons unrelated to HIV status, it could not be said that HIV had limited a major life activity, see id., but defendant makes no such allegation in this case.

Even if it were necessary for plaintiff to claim he wanted to have children, he has done so.  Although plaintiff's memorandum opposing summary judgment neither identifies nor relies upon any life activity whatsoever, plaintiff's sur-reply attaches an affidavit in which Lederer identifies various effects that HIV had on his life.  (See Lederer Aff., June 16, 2006 ("2d Lederer Aff.").)  In this affidavit, Lederer states that although he is gay, he had prior to his infection contemplated entering a heterosexual marriage and having children in the marriage. (2d Lederer Aff. ¶ 6.)  He also states that he had contemplated having children through a surrogate mother, but that the risk of infecting the mother or the child prevented this as well.  (Id. ¶¶ 6, 11.)  These statements are more than sufficient to give rise to a genuine issue of material fact as to whether plaintiff's HIV status substantially limits a major life activity.

Defendant argues that plaintiff is required to produce specific medical testimony about the limitations on his major life activities.  When the risks and consequences of a disease are well-known and well-established, however, plaintiff can carry his burden of proof merely by adducing evidence that he has the disease.[4]  In this case, as discussed above, well-established law

---

[4] Defendant cites Sussle v. Sirina Protection Systems Corp., 269 F. Supp. 2d 285, 301 (S.D.N.Y. 2003), which stated that "[d]istrict courts in the Second Circuit have repeatedly held that a plaintiff's personal testimony which describes the alleged limits that affect a major life activity, without supporting medical testimony, simply is not sufficient to establish his prima facie case under the ADA." Id. at 301 (internal quotation marks omitted).  Sussle, however, dealt with Hepatitis C infection. Id.  The risks to reproduction posed by HIV infection are well-established.  But see Cruz Carrillo v. AMR Eagle, Inc., 148 F. Supp. 2d 142, 145 (D.P.R. 2001)

recognizes the risks AIDS presents to those who wish to have children.  Although it is true that "[a] person alleging a disability protected by the ADA has a burden of establishing with medical evidence the existence of the alleged disability," Fagan v. United Int'l Ins. Co., 128 F. Supp. 2d 182, 186 (S.D.N.Y. 2001), at the summary judgment stage, plaintiff is no more required to provide medical testimony showing that HIV creates a "risk of transmitting a dread and fatal disease to one's child," Bragdon, 524 U.S. at 641, than a blind plaintiff would be required to submit medical testimony showing substantial limitation of the ability to drive.

Defendant is free to argue at trial that HIV does not create a substantial risk of infection of a patient's biological children or surrogate mother, but plaintiff has raised a genuine issue of material fact as to whether such a risk exists and substantially limits his ability to reproduce.[5] Accordingly, summary judgment on the issue of whether plaintiff is disabled for purposes of the ADA must be denied.

_____

(granting judgment as a matter of law because plaintiff at trial had failed to introduce medical evidence showing risk of HIV infection to female sexual partners of men with HIV, or risk of transmission to resulting children).

[5] Plaintiff's evidence that he has AIDS, as distinct from simply being HIV positive, is limited principally to his own testimony.  Although a reasonable factfinder could credit this testimony, the lack of additional evidence does not cast plaintiff's claim in a positive light. Plaintiff submitted, in his most recent filing, a letter dated June 22, 2006, signed by two individuals from the Center for Comprehensive Care in New York City, indicating that "Richard Lederer has AIDS," and stating, "We have been the primary care and psychiatric providers for Richard Lederer since his disability case began.  We both have read Mr. Lederer's affidavit signed June 10, 2006 and we both are in agreement that Mr. Lederer is accurate in what he has deposed."  Letter from Nancy Murphy and Vera Guarion, To Whom It May Concern, June 22, 2006.  This document is not notarized, see Fed. R. Civ. P. 56(e), but in light of defendant's concession for purposes of this motion that Lederer is HIV positive (see D. Mem. at 16), and in light of the analysis above, plaintiff's prima facie case survives the summary judgment motion without reliance on this belated and inadequate submission.

**B.      Whether Plaintiff's Termination Was Because of AIDS, and Whether the Putative Reasons for Termination Were Pretextual**

Defendant also argues that plaintiff has presented insufficient evidence that his termination was "because of his disability," Cameron, 335 F.3d at 63, or for any reason other than his conduct on April 4, 2003.  (D. Mem. at 19, 16-18.)  Because the same evidence is offered to show that plaintiff's termination was because of his disability and that the putative reasons for termination were pretextual, these two questions will be treated together.

Plaintiff does not dispute that he left the worksite without notice, taking money from the cash register, or that the bagels were ruined and the danish left unfinished.[6]  (P. 56.1 Stmt. ¶¶ 72-82.)  Nor does he dispute that these actions violated his conditions of employment (D. 56.1 Stmt. ¶ 85); instead, he argues that "there is a degree of flexibility" in defendant's rules as implemented, and that comparable acts were not treated by defendant with comparable severity. (P. 56.1 Stmt. ¶ 85.)

Of course, a reasonable finder of fact could easily conclude that plaintiff's termination was based upon his violations of the clearly defined work rules.  Being absent without leave and unauthorized borrowing of the employer's receipts would be regarded by most employers as serious violations of the terms of employment, and a jury might well conclude that Lederer's termination followed inexorably from these actions.

---

[6] Plaintiff asserts that he had asked another employee to take the money out of the register for him, so that he himself did not actually remove the money from the register.  (P. 56.1 Stmt. ¶ 76.)  He also argues, in effect, that he reasonably thought the bagels would make it through the night without him.  (Lederer Aff. ¶ 6.)  The undisputed fact remains that Lederer deserted his post with his employer's money.

10

Plaintiff has produced evidence, however, that other violations of comparable seriousness were not met with termination.  For example, plaintiff points to an evaluation of the Bayside BP Connect by a "Mystery Eater" (i.e., an undercover screener employed by BP to evaluate the store without notice to the employees), noting that Lederer was the only employee working in the public area of the store, because two other employees had left work.  (P. Reply Ex. 4.)  Lloyd Tuckman, the General Manager at the Bayside location, testified that he would have seen this evaluation, but that he did not remember any action being taken against the absent employees.  (Tuckman Dep., P. Reply Ex. 7, at 169-81.)  Tuckman also acknowledged that another employee had failed to show up for work three or more times, but had not been fired.  (Id. at 130-34.) Defendant argues that plaintiff, a baker, was more important than the other employees, who were merely "responsible for serving sandwiches."  (Id.)  Defendant also points out that none of these incidents involved taking money from the cash drawer.  (D. Reply at 3.)  Plaintiff asserts, however, that over the previous year, he "had seen other workers cover emergencies by borrowing money in this way."  (Lederer Aff. ¶ 20.)  Although it is a close question whether this entirely unspecific allegation, on its own, could raise an issue of material fact, it is testimony, purportedly based on personal knowledge, that can be considered with the other evidence of inconsistent rule application.  Plaintiff also asserts that Stockman routinely used profane or abusive language with other employees (id. ¶¶ 8-14), which is one of the "Causes for Immediate Discharge" listed in one of defendant's policy manuals (P. Memo. Ex. 3), but was not discharged.  Taken together, these incidents could be seen as evidence that the company gave some employees latitude even when a violation punishable by termination had occurred — in other words, that plaintiff was punished while other similarly situated offenders were not.

11

As to the actual motivation behind plaintiff's termination, plaintiff provides some evidence suggesting discriminatory animus on the part of Lloyd Tuckman, who both parties agree was centrally involved in the decision to fire Lederer.[7]  For example, plaintiff asserts that after Tuckman became aware of plaintiff's HIV status and sexual orientation, both Tuckman and Stockman "spoke to me as little as possible, and were plainly avoiding having any contact with me." (Lederer Aff. ¶ 18.)  Shunning someone after learning of their protected status can be evidence of discriminatory animus.  Moreover, when Stockman learned of Lederer's HIV status and sexual orientation, he immediately called Tuckman, made Lederer leave the office during their conversation, and then called Lederer back into the office to ask him "in intimate detail" about how he had become infected.  (Compl. ¶¶ 47-48.)  A reasonable factfinder could conclude that the conversation with Tuckman prompted these questions, or even that Tuckman had suggested or encouraged them, which would be evidence of discriminatory animus on Tuckman's part.

There is more evidence from which a reasonable factfinder could conclude that plaintiff's HIV status and/or his sexuality were perceived as a problem by Stockman, Lederer's supervisor. For example, plaintiff claims that when he revealed his HIV positive status to Stockman, Stockman responded — after consulting by phone with Tuckman — by asking whether he had

---

[7] Defendant asserts that "Tuckman decided to terminate Lederer" immediately after the incident (D. 56.1 Stmt. ¶ 86), but elsewhere appears to assert that the decision was made by three people jointly:  Tuckman, Cleo Papadatos, the Company Account Executive to whom Tuckman reported (Id. ¶¶ 11, 87), and Miechelle Bertot, the BP human resources representative for the BP site (Id. ¶ 88).  Plaintiff appears to argue that the decision was primarily Tuckman's: "It is Plaintiff's position that Tuckman decided to fire Lederer when he discovered that Lederer was a homosexual man with AIDS." (P. 56.1 Stmt. ¶86.)  As discussed above, however, the evidence could support a conclusion that Stockman was involved in the decision.

gotten it from a man or a woman, and then asking insulting questions about whether plaintiff had

ever had sex at the worksite.  (Lederer Aff. ¶ 17; Compl. ¶¶ 46-48.)  As noted, this conversation

could be seen as evidence of Tuckman's animus, but it is much more direct evidence of

Stockman's views.  Moreover, plaintiff asserts that Stockman decided to write him up for certain

prior absences after learning of plaintiff's HIV status and sexuality, although at the time

Stockman had authorized the absences.[8]  (Lederer Aff. ¶¶ 16, 18.)  If true, this could be evidence

of discriminatory animus on Stockman's part.  Moreover, a reasonable factfinder could conclude,

as Lederer asserts, that the decision to terminate Lederer was made during the conversation in

which Stockman told Tuckman that Lederer was gay and had AIDS (P. 56.1 Stmt. ¶ 86), and

thus that Stockman participated in the decision.

It should be noted that the allegations discussed above pertain both to Lederer's HIV

status and his sexual orientation; plaintiff has offered little or no evidence suggesting the extent

to which HIV status was an independent basis for his mistreatment.  To prevail under the ADA,

plaintiff must show discrimination based on his disability, and not based on some other reason,

however distasteful or otherwise unlawful the other reason might be.  See, e.g., Lai v. New York

City Gov't, 991 F. Supp. 362, 364-365 (S.D.N.Y. 1998) ("While discrimination against

non-residents may be objectionable, it is not prohibited by the ADA.  As this is the only form of

discrimination the plaintiffs have alleged, they have failed to state a claim under the ADA.").

Given the common stereotypes linking homosexuality and HIV/AIDS, as evidenced by the close

---

[8] Defendant argues that Lederer's affidavit should be disregarded on this point because his deposition testimony contradicts it.  (D. Reply at 9.)  In the cited deposition testimony, however, Lederer acknowledges receiving the write-up "on or about March 15, 2003" (Lederer Dep. at 87), which was about one week after Stockman learned of Lederer's HIV status (Lederer Aff. ¶17), and well after the February absences on which the write-ups were based (Id. ¶ 16).

association in Stockman's alleged remarks between Lederer's HIV status and his sexuality, it may be difficult to sort out the nuance of Stockman and Tuckman's bias even if Lederer's version of these events is true.  But that is a task for the factfinder.  Lederer's evidence is sufficient to raise an issue of fact as to whether Tuckman and Stockman exhibited animus against persons who were HIV positive, and whether any such animus drove the decision to fire Lederer.

        In general, plaintiff's evidence is thin, but it suffices to raise an issue of fact for trial. Plaintiff relies heavily on his own testimony, which is subject to impeachment on a number of grounds; it is self-serving and largely uncorroborated, and other aspects of his testimony (for example, his explanation of his whereabouts on the night he left work, which involves a rental car and several taxis for which plaintiff has failed to obtain any documentation whatsoever, to say nothing of the person plaintiff claims rented the car for him, who denies doing any such thing (Katz Aff., P. Reply Ex. 10, at 11)), are highly suspect.  The odds of plaintiff's obtaining a favorable verdict may be long.  Nonetheless, there is evidence in the record from which a reasonable factfinder might conclude that plaintiff's misconduct was merely a convenient excuse for his firing, and that defendant might have tolerated that misconduct if not for his HIV status. Accordingly, summary judgment on the ADA claim must be denied.

## III.   <u>The Wrongful Termination Claims Under State and Municipal Law</u>

        Plaintiff also alleges wrongful termination under the NYHRL and NYCHRL, apparently alleging that he was terminated both because of his sexual orientation and because of his disability status.  (Compl. ¶¶ 74-88.)  Supplemental jurisdiction over these claims exists because they are "so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a).

14

The state claims are governed by the same <u>McDonnell Douglas</u> burden-shifting framework discussed above.  <u>See</u> <u>Rodal v. Anesthesia Group of Onondaga, P.C.</u>, 369 F.3d 113, 117. n.1 (2d Cir. 2004) ("New York State disability discrimination claims are governed by the same legal standards as federal ADA claims."); <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 n.1 (2d Cir. 2000) (noting that the same standards cover wrongful termination claims brought pursuant to New York State and New York City law).  The wrongful termination claims based on disability are subject to the same analysis as the ADA claim discussed above, and because the evidence of discriminatory animus on the basis of sexual orientation is closely tied to, but if anything stronger than, the evidence concerning HIV status, summary judgment on the state and municipal wrongful termination claims must be denied.

## IV.     The Federal Hostile Work Environment Claim

Plaintiff alleges that Stockman's alleged comments subjected him to a hostile work environment in violation of Title VII.  (Compl. ¶¶ 89-94.)  Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . .  to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Plaintiff argues that the alleged anti-gay comments by Stockman amounted to discrimination "because of . . . sex" within the meaning of the statute.  (P. Mem. at 9.)

"Title VII does not prohibit harassment or discrimination because of sexual orientation." <u>Simonton v. Runyon</u>, 232 F.3d 33, 35 (2d Cir. 2000).  Plaintiff argues that he is entitled to pursue his claims under <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 79-80 (1998) (holding that Title VII does not categorically bar claims of hostile work environment created by

male-on-male sexual harassment).  But the Second Circuit has rejected the argument that Oncale

creates Title VII liability for harassment on the basis of sexual orientation.  Simonton, 232 F. 3d

at 36.  Harassment on the basis of failure to conform to gender stereotypes (as opposed to

harassment on the basis of sexual orientation) can be the basis for a Title VII claim; as the

Second Circuit has noted, "individual employees who face adverse employment actions as a

result of their employer's animus toward their exhibition of behavior considered to be

stereotypically inappropriate for their gender may have a claim under Title VII."  Dawson v.

Bumble & Bumble, 398 F.3d 211 (2d Cir. 2005).  But plaintiff has not attempted to argue that

Stockman's comments pertained to gender stereotypes, as opposed to sexual orientation; nor,

indeed, is there any evidence of plaintiff's supervisor's views regarding Lederer's conformity

with stereotypical ideas of masculinity.  See Bibby v. Philadelphia Coca Cola Bottling Co., 260

F.3d 257, 264 (3d Cir. 2001) (holding that a gay male plaintiff had no claim under Title VII

because "he did not claim that he was harassed because he failed to comply with societal

stereotypes of how men ought to appear or behave").  Accordingly, plaintiff's claims under Title

VII must be dismissed.[9]

## V.      The State Hostile Environment Claim

New York State law makes it unlawful for an employer "because of the . . . sexual

orientation . . . of any individual, to . . . discharge from employment such individual or to

discriminate against such individual in compensation or in terms, conditions or privileges of

---

[9] Defendant also argues that Title VII does not protect against discrimination on the basis of HIV status.  (D. Mem. at 25.)  Nowhere in the Complaint or in plaintiff's papers opposing summary judgment, however, does plaintiff assert a Title VII claim with regard to HIV/AIDS. Accordingly, this argument need not be addressed.

employment."  N.Y. Exec. Law § 296(1)(a).[10]  Plaintiff alleges that "[t]he prolonged

perpetuation of this hostile environment and the failure of Defendant to act when it had notice of

the harm that it caused" violates this statute.[11]   (Compl. ¶ 96.)

 Although the federal hostile environment claims must be dismissed, the state hostile

environment claim arises from the same facts and events discussed in connection with the

wrongful termination claims discussed above.  Moreover, the relevant evidence concerning the

ADA claim is essentially the same as the relevant evidence concerning the state hostile

environment claims.  These claims may therefore be treated as part of the same case or

controversy and supplemental jurisdiction exists under 28 U.S.C. § 1367(a).  See Exxon Mobil

Corp. v. Allapattah Servs., Inc., 545 U.S. 546, ___, 125 S. Ct. 2611, 2613 (2005) ("Section

1367(a) is a broad grant of supplemental jurisdiction over other claims within the same case or

controversy, as long as the action is one in which the district courts would have original

jurisdiction.").

 State law hostile environment claims are analyzed under the same standards as Title VII

claims.  See Citroner v. Progressive Cas. Ins., 208 F. Supp. 2d 328 (E.D.N.Y. 2002).  In order to

survive summary judgment on a claim of hostile work environment harassment, a plaintiff must

---

 [10] The NYHRL made sexual orientation a protected trait as of January 16, 2003.  See N.Y. Exec. Law § 296(1)(a).  At least one court has held that the law applies prospectively only. See Logan v. Salvation Army, 809 N.Y.S.2d 846, 849 (N.Y. Sup. Ct. 2005).  Lederer's termination and at least some of the allegedly abusive conduct, including the remarks that followed Lederer's March 2003 disclosure of his sexual orientation to Stockman, took place after that date.  Defendant has not made any arguments relating to whether any of the abusive conduct predates the effective date of the relevant law, nor is it clear from the evidence when much of the alleged conduct took place, so the question will not be addressed further here.

 [11] It appears that plaintiff intends to raise a hostile environment claim based on sexual orientation and not disability.  (See Compl. ¶¶ 89-94.)

produce evidence that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'"  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993), quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986).  This determination is made after reviewing the record as a whole, and considering the totality of the circumstances.  Demoret v. Zegarelli, 451 F.3d 140 (2d Cir. 2006).

Defendant makes two arguments for summary judgment on the state hostile environment claim: that Lederer should be equitably estopped from complaining about anti-gay remarks because he hid his sexual orientation from defendant and its employees, and that defendant is entitled as a matter of law to an affirmative defense for employers whose grievance procedures are not taken advantage of.

### A.    Equitable Estoppel and the Sufficiency of Plaintiff's Evidence

Defendant's first argument is that principles of equitable estoppel should be applied to bar plaintiff from claiming that homophobic comments created a hostile work environment.  (D. Mem. at 22-23.)

Under New York law, equitable estoppel requires a showing of "(1) a concealment of facts or misrepresentation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoers; (4) reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment."  General Elec. Capital Corp. v. Armadora, S.A., 37 F.3d 41, 45 (2d Cir. 1994).  The first and third prongs are satisfied, because Lederer knew he was gay and concealed the fact from his co-workers.  To say that defendant and its employees relied on these misrepresentations in

18

making homophobic remarks, however, would be to misread the facts as alleged and to punish an alleged victim of mistreatment for attempting to hide from abuse.

Lederer claims he invented the stories about a wife and children because he had heard anti-gay comments and was intimidated.  (See D. 56.1 Stmt. ¶ 49.)  It would seem perverse to hold that a discrimination plaintiff may be denied relief when he is intimidated by a hostile workplace into hiding his protected status.  Nor would it seem consistent with the purpose of the civil rights laws to allow such an employer to escape liability merely because its employees made abusive comments only when they believed that members of the protected class were out of earshot.  Cf. Torres v. Pisano, 116 F.3d 625, 633 (2d Cir. 1997) ("The fact that many of [defendant's] statements were not made in [plaintiff's] presence is, in this case, of no matter; an employee who knows that her boss is saying things of this sort behind her back may reasonably find her working environment hostile.").  Nor would it seem fair to permit an employer who allows an anti-gay climate to flourish to find support in equity when a member of the protected class joins the workplace or makes himself known.

This summary judgment motion does not require an answer to the question of whether a discrimination plaintiff must show that the creators of the hostile work environment were aware of his status, however, because there is evidence in the record suggesting that the defendant's employees did believe Lederer to be gay and would not have stopped their harassment in any event.  This evidence defeats defendant's arguments concerning equitable estoppel and suffices to defeat summary judgment on the question of hostile work environment.

A reasonable factfinder could conclude that Stockman believed Lederer to be gay prior to Lederer's disclosure.  For example, Lederer claims that Stockman often singled him out for

conversations about homosexuality, saying things like "I don't know how two men get it on like that," and specifically talking in graphic terms about oral and anal sex between men.  (Lederer Dep. at 275.)  Stockman allegedly asked Lederer, "Could you ever see yourself . . . blowing another man[?] Isn't that disgusting?"  (Id.)  Lederer also claims that Stockman repeatedly questioned him "in a very loud, obnoxious and taunting tone" as to whether he "wanted to blow" Stockman.  (Compl. ¶¶ 33-34)  Overall, Lederer claims that Stockman and other co-workers "subjected him several times each week to homophobic comments."  (D. 56.1 Stmt. ¶ 47.)  At least one other employee corroborates Stockman's particular interest in questioning Lederer about his sexuality, apparently because he suspected Lederer of being gay.  (Bennett Aff. ¶¶ 10-11.)  A reasonable factfinder could conclude that a pattern of such questions and comments shows that Stockman believed Lederer to be homosexual when he made the abusive comments.

As to whether defendant is correct that a disclosure of Lederer's sexual orientation would have stopped the harassment, Lederer claims that Stockman's response to Lederer's disclosure of his sexual orientation was to ask whether Lederer had been "blowing guys in the [kitchen] cooler" (Compl. ¶ 49), after which Stockman stopped talking to Lederer.  (Lederer Aff. ¶ 18).  This does not suggest a sudden onset of tolerance and civility.

In short, the evidence, viewed in the light most favorable to plaintiff, does not suggest that defendant or its employees relied on Lederer's professions of heterosexuality to its detriment when making anti-gay remarks.  Moreover, plaintiff has adduced evidence from which it might reasonably be concluded that the incidents of abusive language and behavior were "of sufficient severity" to so "alter the terms and conditions of employment as to create such an environment."

Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004).  Accordingly, defendant's

argument for summary judgment on this point fails.

      **B.**    **Affirmative Defense**

      Defendant's second argument is that it is protected from liability by the affirmative

defense set forth in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), which requires "(a)

that the employer exercised reasonable care to prevent and correct promptly any sexually

harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of

any preventive or corrective opportunities provided by the employer or to avoid harm

otherwise." Id. at 807.

      Lederer made two complaints to Lloyd Tuckman about sexually inappropriate behavior

in the workplace.  The first complaint, in September 2002, concerned inappropriate sexual

comments Stockman had made to young women working at the cafe, as well as sexual

nicknames he used to refer to Lederer.  (Lederer Aff. ¶ 12.)  Plaintiff believes that Tuckman took

at least some action in response to this complaint, because Stockman later said to him, "Thanks a

lot," which suggested to Lederer that Tuckman had told Stockman of Lederer's complaint.  (Id.

¶ 13.)  Lederer also states that after this remark, Stockman "seemed to be a little more careful

when I was around." (Id.)  Defendant offers this as evidence of reasonable care taken to prevent

sexually harassing behavior.  Although this evidence supports an inference that Tuckman

mentioned Lederer's complaint to Stockman, it does not show that Tuckman in any way

disciplined Stockman.  Nor does Tuckman appear to have told Lederer he would take any action

whatsoever.  A reasonable factfinder could conclude that Tuckman merely mentioned Lederer's

complaint to the offending employee, and that this did not constitute "reasonable care to prevent and correct promptly any sexually harassing behavior." Faragher, 524 U.S. at 807.

Lederer's second complaint, in about November 2002, concerned the treatment of another employee, Michael Brown, whom most of the other employees apparently understood to be gay. (D. 56.1 Stmt. ¶¶ 67-69.) Lederer complained to Tuckman about Stockman's repeated anti-gay remarks about Brown, but Tuckman merely said "I guess you'd have to be deaf, dumb and blind [to] not see that, wouldn't you" (Lederer Dep. at 257), meaning it was obvious that Brown was gay, and took no further action. Defendant contends that this was reasonable because the remarks were all made in Brown's absence; therefore, it believes, "there was no victim." (D. Mem. at 24.)

Defendant is entitled to argue these positions at trial, but a reasonable factfinder could determine that Tuckman's response to these complaints did not constitute "reasonable care to prevent and correct promptly any sexually harassing behavior." Faragher, 524 U.S. at 807. Indeed, Lederer asserts that "Lloyd made it clear that if the man didn't want people jeering at him, he should have hidden [t]he fact that he was gay." (Lederer Aff. ¶ 14.) Perhaps, as defendant argues, it was reasonable for Tuckman to take no action in response to this second complaint, in light of the fact that the comments were not being made in the presence of any known gays or lesbians. Such a conclusion is hardly required, however. A rational factfinder could conclude that an employer notified of repeated anti-gay comments being made about a gay employee should take some action, even if it appears that the employee has not yet learned of the

comments.  Accordingly, there remains a genuine issue of material fact as to this affirmative

defense, and summary judgment on the state hostile work environment claims must be denied.[12]

## CONCLUSION

For the foregoing reasons, plaintiff's hostile work environment claim under Title VII is

dismissed, but summary judgment as to all other claims is denied.  The motion for summary

judgment (Doc. # 12) is granted in part and denied in part.


SO ORDERED.

Dated: New York, New York
      November 30, 2006

                                      GERARD E. LYNCH
                                United States District Judge

---

[12] Because there is a genuine question of material fact as to whether defendant can satisfy the first prong of the affirmative defense, there is no need to determine whether plaintiff failed "to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise" and thus satisfied the second prong of the defense.  Faragher, 524 U.S. at 807; see id. ("The defense comprises two necessary elements").

23